IN THE OREGON TAX COURT
MAGISTRATE DIVISION
Property Tax

BENNETT FAMILY TRUST,         )
         )
        Plaintiff,         )    TC-MD 120096C
         )
      v.         )
         )
DESCHUTES COUNTY ASSESSOR,    )
         )
        Defendant.        )   **DECISION**

Plaintiff appeals the real market value (RMV) of property identified as Account 143031 (subject property) for the 2011-12 tax year. Trial was held at the Oregon Tax Court on October 10, 2012. H. Robert H. Bennett, licensed real estate broker (Bennett), appeared and testified on behalf of Plaintiff. Sharra Tisiot, commercial appraiser (Tisiot), appeared and testified on behalf of Defendant.

Plaintiff's Exhibits 1 through 9 and Defendant's Exhibits A through H were admitted without objection.

## I. STATEMENT OF FACTS

The subject property is a 5.14 acre lot in Sisters, Oregon, known as "Sisters Mobile Home Park." (Def's Ex C at 4.) Tisiot testified that the property is improved with three apartment units, an office, a laundry facility, and paved asphalt spaces with underground utilities and sewer connections. Bennett testified that the subject property has the space and the electrical capacity to host seven mobile homes and 31 recreational vehicles.

Bennett testified that the subject property generates income through rentals as follows: seven on-site mobile homes are leased annually, three apartments are rented by the month, a few RV spaces are rented "full time," and the remainder are available by the day or by the week to

transients, "catch as catch can." Bennett testified that 60 percent of the subject property's income comes from the mobile home and apartment rentals. Among the property's larger expenses are utilities, maintenance, insurance, and management fees. (*See* Ptf's Ex 7 at 3.)

The property's listing history may be partially reconstructed from exhibits and testimony. Bennett presented an excerpt from a prior appraisal of the subject property showing that it had been listed for $1,709,000 in January 2009, and that its asking price had been considerably reduced over time. (Ptf's Ex 5D.) That asking price was set at $990,000 in May 2010. (*Id.*) Tisiot testified that the subject property's listing price of $990,000 expired on September 30, 2010. Umpqua Bank acquired the subject property by deed in lieu of foreclosure in January 2011. (Def's Ex G at 1-7.) Tisiot testified that the bank listed the subject property at $749,000 until the time of Plaintiff's purchase in mid-2011. Bennett testified that the bank negotiated with a potential buyer in March 2011 who rejected the bank's counteroffer to sell the subject property for $625,000.

On June 18, 2011, Umpqua Bank accepted Plaintiff's offer to purchase the subject along with an additional parcel, and seven mobile homes, for a total consideration of $500,000. (Ptf's Exs 1, 1A, 2; Def's Ex G at 11-12.) The sale was concluded on August 30, 2011. (*Id.*) Plaintiff purchased the property with other investors. Bennett testified that the additional parcel provides secondary access to the highway for the subject property. The 2011-12 tax roll RMV of the additional parcel was $143,360, although the stated consideration for the deed by which the bank acquired it was $21,000. (Ptf's Ex 3 at 2; Def's Ex G at 8-10.) The sum of the 2011-12 tax roll RMVs of the seven mobile homes is $74,330. (*See* Ptf's Ex 3 at 3-8.)

Bennett provided income calculations according to which he concluded that the property was worth $495,500 at the time he purchased it in August 2011. (Ptf's Ex 6 at 3.) In those

calculations Bennett projected "total income" of $131,320 and expenses of $94,650 (including $8,250 in property taxes). (*Id*.) Bennett deducted the latter from the former to reach a net "cash" of $36,670. (*Id*.) Bennett testified that those figures were based on profit and loss statements provided by the previous owner. (*See id*. at 1; Ptf's Ex 7 at 1.) Bennett further testified that actual net operating income (NOI) for 2009 was $23,687 and for the 12 month period between September 2011 through August 2012 was $22,825. (Ptf's Exs 6 at 1b; Ex 7 at 4.) Bennett divided his "cash" figure by a capitalization rate of 7.4 percent to reach his projected RMV of $495,500. (Ptf's Ex 6 at 3.) Plaintiff did not provide market data to establish Bennett's chosen capitalization rate.

Tisiot testified that typical expenses for "mobile home and RV parks" were in the range of 40 percent, whereas the subject property's reported expenses were significantly higher.[1] Bennett testified that the subject property's dual purpose as an RV park as well as a mobile home park increased staff and utilities expenses. Plaintiff did not provide market data to establish what expense ratio is typical among similar properties. Tisiot supported her testimony with unadjusted data from a third party appraisal in a table labeled "Income/Expense Data for Mobile Home Parks (Confidential Sources)." (Def's Ex C at 49.)

Defendant submitted into evidence an appraisal commissioned by Umpqua Bank and dated August 31, 2010 (the Bratton appraisal). (Def's Ex C.) That appraisal, prepared by Scott D. Thomas and Dana L. Bratton, found that the subject property was in a transition phase, that its value as of August 24, 2010, was $830,000, and projected that it would have a value of $890,000 upon reaching stabilization by August 31, 2012. (*Id*. at 3.) The authors opined that the subject property required a 12 month marketing period to yield full value, and that if it were

---

[1] After removing property taxes from Plaintiff's projected expenses, the expense ratio is 66 percent.

marketed for sale within six months its "disposition value" would be $665,000. (*Id*. at 3,12, 65.) Bennett testified that the Bratton appraisal contained inaccuracies that skewed its assessment of the subject property; in particular, that it failed to account for limitations in the subject property's use caused by the existing electrical service and the electrical requirements of mobile homes. Bennett testified that those limitations, not accounted for in the Bratton appraisal, caused an over-estimate of income in that report. Neither author of the Bratton appraisal testified.

Defendant submitted printouts from LoopNet containing sales data for comparable properties. (Def's Ex D.) Two of the comparables are in Deschutes County, one in Bend and one in La Pine. (*Id*. at 1-4.) The remaining properties are in distant communities in western and southern Oregon, including Albany, Eagle Point, White City, and Klamath Falls. (*Id*. at 5-18.) The La Pine comparable reportedly contains 14 "spaces" and two "site built" buildings, and sold in November 2010 for $320,000, or $20,000 per site. (*Id*. at 1.) The printout of the Bend comparable states that it contains six spaces, including "three homes one a manufactured home[] & 1 manufactured home." (*Id*. at 3.) The Bend property reportedly sold for $334,500 in December 2010, or $55,750 per space. (*Id*.) Tisiot claimed familiarity with the properties, but was unable to recall any details about them other than what was contained in the printouts. Bennett questioned the comparability of "site built" homes at the La Pine property, and the absence of recreational vehicle spaces at the Bend property.

By order dated February 17, 2012, the Deschutes County Board of Property Tax Appeals reduced the subject property's 2011-12 land RMV from $1,037,850 to $629,600, and reduced the RMV of its structures from $201,560 to $142,400, for a total RMV of $772,000. (Ptf's Am Compl at 2.) The subject property's 2011-12 maximum assessed value is $614,440. (*Id*.) Plaintiff appeals the land RMV only and requests this court to find a land RMV of $282,310,

which would bring the subject property's total RMV to $424,710. (*See id*. at 1.) Defendant counterclaims for a total RMV of $890,000. (Def's Ans at 1.)

## II. ANALYSIS

A.    *Real market value and the burden of proof*

The issue to be decided is the total RMV of the subject property as of the assessment date of January 1, 2011. Under ORS 305.287 (2011),[2] a party may not limit the scope of an appeal to one component of the property tax account if the opposing party seeks a determination of total RMV.[3] Here, even though Plaintiff appealed only the subject property's land value, Defendant has placed the whole value of the property before the court by its request for a determination of total RMV.

Except for exemptions and special assessments, real property in Oregon is assessed at the lesser of its RMV or its maximum assessed value. ORS 308.146(2); ORS 308.232. RMV is "the amount in cash that could reasonably be expected to be paid by an informed buyer to an informed seller, each acting without compulsion in an arm's-length transaction occurring as of the assessment date for the tax year." ORS 308.205(1). RMV is to be determined "in all cases" by "methods and procedures in accordance with rules adopted by the Department of Revenue." ORS 308.205(2). The Department of Revenue has mandated the consideration of three approaches to real property valuation: the "sales comparison approach, cost approach, and income approach." OAR 150-308.205-(A)(2)(a). Not every approach will be applicable to every property. *Id*.; *see e.g*. *Allen v. Dept. of Rev.*, 17 OTR 248, 252 (2003). The valuation approach

---

[2] Unless otherwise noted, references to the Oregon Revised Statutes (ORS) are to 2009.

[3] ORS 305.287 (2011) applies to all appeals to the Magistrate Division filed on or after September 29, 2011. *See Village at Main Street Phase II, LLC v. Dept. of Rev.*, TC 5054, WL 3024117 at *6 (July 11, 2012); Or Laws 2011, ch 397. The instant appeal was filed on or about March 12, 2012.

or approaches to be used is "a question of fact to be determined by the court upon the record." *Pacific Power & Light Co. v. Dept. of Rev.*, 286 Or 529, 533, 596 P2d 912 (1979).

In the Tax Court, the burden of proof falls "upon the party seeking affirmative relief." ORS 305.427. That burden may be sustained by "a preponderance of the evidence," that is, by "the more convincing or greater weight of evidence." *Id*.; *Feves v. Dept. of Revenue*, 4 OTR 302, 312 (1971). Here, Plaintiff bears the burden to prove its requested RMV and Defendant bears the burden to prove the RMV requested in its counterclaim.

To sustain the burden of proof a party must provide competent evidence of the RMV." *Poddar v. Dept. of Rev.*, 18 OTR 324, 332 (2005) (citations omitted). Such evidence includes "appraisal reports and sales adjusted for time, location, size, quality, and other distinguishing differences, and testimony from licensed professionals such as appraisers, real estate agents and licensed brokers." *Metzger v. Clatsop County Assessor*, TC-MD No 120534D at 5 (Oct 30, 2012).

Ultimately, the real market value of a property is a question of fact and the court is responsible to determine what it is. *Chart Development Corp. v. Dept. of Rev.*, 16 OTR 9, 11 (2001) (citation omitted). This court has authority to determine the value of property "on the basis of the evidence before [it], without regard to the values pleaded by the parties." ORS 305.412.

B.  *Valuation of the subject property*

The strongest evidence of the subject property's RMV is the price at which the bank agreed to sell it in an arm's-length transaction five and one-half months after the assessment date.

/ / /

A property's sales price in a "recent, voluntary, arm's length transaction" between knowledgeable and willing parties is "very persuasive" of RMV. *Kem v. Dept. of Rev.*, 267 Or 111, 114, 514 P2d 1335 (1973). The court's inquiry into the evidentiary value of the subject property's sales price hinges on whether the sale was "recent" and arm's-length.

Whether a subject property's sale is "recent" does not depend exclusively on the passage of time, but rather on the similarity of the market conditions on the sale date and the assessment date. *Sabin v. Dept. of Rev.* (*Sabin*), 270 Or 422, 426-27, 528 P2d 69 (1974). A sale date that is not too distant from the assessment date will be presumed recent unless evidence of change in the underlying conditions is presented. *Id*. at 427-28 (reversing lower court's determination to disregard sale occurring nearly two years after assessment date because no evidence of change in market conditions); *see also West Side Lube, Inc. v. Washington County Assessor* (*West Side Lube*), TC-MD No 040417C, WL 2007216 at *3 (Aug 22, 2005) (sale 18 months after assessment date recent because no evidence of significant change in market conditions); *cf. Jennings Family Trust v. Lane County Assessor*, TC-MD No 120129, WL 4715161 at *4 (Oct 4, 2012) (sale six months after assessment date not recent where testimony indicated three percent rate of decline in market over intervening months). Where the interval between the sale date and the assessment date is too great, the market conditions may be found to have changed as a matter of law and the sale will be disregarded. *Sabin*, 270 Or at 427.

In determining whether a sale of a subject property is arm's-length, the court closely examines sales of bank-owned properties because "property purchased through foreclosure may well involve an element of compulsion on the part of the seller." *Yarbrough v. Marion County Assessor*, TC-MD No 070229C, WL 4440216 at *4 (Dec 12, 2007) (footnote omitted). That is so for several reasons, including the possibility that a lender has "a policy of selling such

property only for the amount of the underlying debt, regardless of what the property may actually be worth, particularly if it would take a few months more to find a buyer willing to pay a higher price." *Kryl v. Lane County Assessor* (*Kryl*), TC-MD No 100192B, WL 1197444 at *2 (Mar 30, 2011). Even where a bank sale indicates distress, if a majority of sales in a market are distressed, then such a sale has been considered to reflect the market and should not be excluded. *Morrow Co. Grain Growers v. Dept. of Rev.* (*Morrow Co. Grain Growers*), 10 OTR 146, 148 (1985). The Department of Revenue (DOR) sanctioned the use of "distressed" sales, including foreclosures and short sales, provided there was sufficient market evidence to support their use. *Voronaeff v. Crook County Assessor*, TC-MD 110361C, WL 1426847 *5 (2012) (citing DOR Memo stating in part: "[i]f, in your opinion, the current economics and market conditions as of the valuation date, indicate some level of distress is a common market characteristic, it is appropriate to include such sales in a comparable sale's value analysis").

If a property has been marketed for a sufficiently long period of time, and properly exposed to the market, etc., the implication of distress on the part of the seller is removed and a bank sale may be found to be arm's-length. *Ward v. Dept. of Revenue* (*Ward*), 293 Or 506, 508, 650 P2d 923 (1982). The courts have found that a marketing period of between one and two years is sufficiently long. *Id.* (bank acquired property in 1976, taxpayer agreed to purchase in January 1978, and taxpayer completed purchase in June 1978); *Ernst Brothers Corp. v. Dept. of Rev.* (*Ernst Bros.*), 320 Or 294, 305, 882 P2d 591 (1994) (18 month marketing period sufficient where expert had testified that a one to five year marketing period was necessary); *but cf. Kryl*, TC-MD No 100192B at 5 (June 6, 2011) (three month listing period insufficient). For purposes of establishing that a property has been adequately marketed, the time that it was listed before the bank's acquisition is added to the bank's marketing time. *See Brashnyk v. Lane County*

*Assessor* (*Brashnyk*), TC-MD No 110308, WL 6182028 at *6 (Dec 12, 2011) (total five year listing period, including four years prior to bank's acquisition, persuasive that bank sale reflected market value).

In the present case, the agreement to purchase the subject property five and one-half months after the assessment date was "recent" because no evidence of a change in market conditions was introduced. *See Sabin*, 270 Or 427. The interval between assessment and sale is not so great that the court can find as a matter of law that the market had changed. *See id.* at 427-28. Therefore, the court may only find that that market conditions changed during the interval if presented with evidence to that effect. *See id.* at 427. No such evidence of market conditions was presented by either party. Therefore, the court accepts the sale as "recent."

Likewise, Plaintiff's purchase of the subject property from the bank appears to have been arm's-length because the property's lengthy exposure to the market shows that its sales price reflects a market valuation rather than a seller operating under compulsion. *Cf. Ward*, 293 Or at 308. It was listed for over two years. During the 12 months prior to the sales date, its asking price ranged from $990,000 to $749,000, or from 11 percent more to 16 percent less than the stabilized RMV determined by the Bratton appraisal. The fact that it did not sell for its listing price is perhaps explicable from the profit and loss records provided by Plaintiff, which show that the subject property has generated only a modest income for its owners in the years leading up to the assessment date and after that date. Its listing history is a record of deep discounts failing to attract buyers, and in the end the property only sold with an additional parcel and personal property included in the deal.[4]

---

[4] The listing history, outlined in the Statement of Facts set forth above, indicates that the property was listed for approximately $1.7 million in January 2009, later reduced to $990,000 from May through September 2010, and then further reduced to $749,000 after the bank acquired the property in lieu of foreclosure in January 2011, until Plaintiff's purchase in June 2011 (the date Plaintiff's purchase offer was accepted by Umpqua Bank).

The price Plaintiff paid for the subject property is strong evidence that its RMV is no more than $500,000, the combined price Plaintiff paid for both parcels and the mobile homes. However, the court lacks sufficient evidence to determine whether or how much the RMV of the subject property is less than that combined price.

Plaintiff's proposal to deduct the real market values of the additional parcel and the mobile homes from that sales price is unpersuasive because "market value of a large parcel does not necessarily equal the sum of the market value of the parts." *Ward,* 293 Or at 510; *see also Hammer-Alberts LLC v. Lane County Assessor*, TC-MD No 000406F, WL 1059528 (July 6, 2000) (rejecting similar valuation formula in uncontested trial). Typically, smaller parcels are more marketable than larger ones and therefore command a higher price per unit. *Ward*, 293 Or at 510. Moreover, this court has generally rejected the residual method Plaintiff proposes, which is to subtract the RMV roll values of the other property from the purchase price, because roll values are the product of mass appraisal techniques whereby statistical trends are applied each year to generate values for tax purposes. *Cf. Richards v. Malheur County Assessor*, TC-MD No 040336C at 5 (Apr 12, 2005) (rejecting calculation of RMV from tax roll values of similar properties because roll values are based on mass appraisal techniques rather than market data). The better, and generally accepted approach, is to use market-derived data. Finally, the "additional" property Plaintiff purchased (which is not at issue in this appeal) may have had little or no value on its own. There is simply not sufficient persuasive evidence for the court to make that determination.

Other evidence presented by the parties is given little weight. The authors of the Bratton appraisal did not testify, leaving the court unable to assess the weight to be given to their conclusions. The income approach calculation provided by Plaintiff was insufficiently supported

by market data as opposed to the subject property's history. And the printouts of unadjusted property data from around the state submitted by Defendant were not sufficient to support a valuation based on sales comparables.

That result is consistent with prior cases. Although it is true that the court has on a number of occasions stated that it viewed bank sales as suspect, there have also been a number of occasions in which a taxpayer has prevailed on the basis of the purchase price of a bank-owned property. *See*, *e.g.*, *Ernst Bros.*, 320 Or 294; *Sabin*, 270 Or 422; *Morrow Co. Grain Growers*, 10 OTR 146; *Brashnyk*, TC-MD No 110308; *West Side Lube*, TC-MD No 040417C.

Therefore the court finds that Plaintiff has shown by a preponderance of the evidence that the subject property's RMV as of January 1, 2011, is no more than $500,000.

### III. CONCLUSION

After careful consideration of the testimony and evidence, the court concludes that the real market value of the subject property as of the assessment date was the price for which it sold in conjunction with additional real and personal property. Now, therefore,

IT IS THE DECISION OF THIS COURT that Plaintiff's appeal is granted in part and denied in part, and that the 2011-12 real market value of the property identified as Account 143031 is $500,000.

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

IT IS FURTHER DECIDED that Defendant's counterclaim is denied.

Dated this ____ day of December 2012.


_____
DAN ROBINSON
MAGISTRATE


*If you want to appeal this Decision, file a Complaint in the Regular Division of the Oregon Tax Court, by <u>mailing</u> to: 1163 State Street, Salem, OR 97301-2563; or by <u>hand delivery</u> to: Fourth Floor, 1241 State Street, Salem, OR.*

*Your Complaint must be submitted within <u>60</u> days after the date of the Decision or this Decision becomes final and cannot be changed.*

*This document was signed by Magistrate Dan Robinson on December 19, 2012. The Court filed and entered this document on December 19, 2012.*