IN THE OREGON TAX COURT
MAGISTRATE DIVISION
Property Tax

BRET A. DAVIS,                                )
                                             )
                Plaintiff,                   )    TC-MD 150164C
                                             )
        v.                                   )
                                             )
CLACKAMAS COUNTY ASSESSOR,                   )
                                             )
                Defendant.                   )    **FINAL DECISION**

This Final Decision incorporates without change the court's Decision, entered August 11, 2015. The court did not receive a statement of costs and disbursements within 14 days after its Decision was entered. *See* TCR-MD 16 C(1).

Plaintiff appeals the real market value (RMV) of property identified as Account 05010141 (subject property) for the 2014-15 tax year. A trial by telephone was held on June 17, 2015. Bret A. Davis (Plaintiff) appeared and testified on his own behalf. Brad Erland (Erland) appeared and testified on behalf of Defendant. Plaintiff's Exhibits 1, 2, 5, and 7 were received without objection.[1] Defendant's Exhibit A was received without objection.

## I. STATEMENT OF FACTS

The subject property is a multi-level, 5,581 square-foot, single-family home that was built in 2006.[2] (Def's Ex A at 4.) The home is located on a 23,958 square-foot lot in Happy Valley, Oregon. (*Id.* at 10.) The home is custom-built, with four bedrooms, three full bathrooms, and one half bathroom; it has views of Mt. St. Helens and Portland. (*Id.* at 4.)

/ / /

---

[1] The trial exhibits that Plaintiff offered into evidence were labeled "Item[s]" 1, 2, 5 and 7. The court refers to them here as Exhibits 1, 2, 5, and 7.

[2] Plaintiff's Exhibit 7 states that the area of the subject property is 5,493 square feet. Plaintiff stated at the opening of trial that he agreed with Erland's measurement of the property, which was 5,581 square feet.

Plaintiff purchased the subject property at auction through an online auction website, Auction.com. (Ptf's Ex 1 at 1.) Plaintiff's winning bid for the subject property was $491,500. (*Id.*) Plaintiff also paid an additional $24,575 as a "buyer's premium," but he testified that he did not consider the buyer's premium to be part of the purchase price. (*See also* Ex 1 at 1.) Plaintiff testified that at the time of sale the property was owned by a bank that had obtained it through foreclosure. Plaintiff testified that he purchased the subject property "as-is" and that his bid was "cash only." (*See also* Ex 2 at 1.) Plaintiff and Defendant agreed that the subject property was missing appliances and in need of repairs at the time of sale, but the parties disagreed over the scope and cost of those repairs. (*See* Ptf's Ex 5 at 1; Def's Ex A at 4, 10.)

Defendant placed an RMV of $971,806 on the subject property for tax year 2014-15. (Ptf's Compl at 3.) The subject property's maximum assessed value (MAV) for the 2014-15 tax year was $760,331. (*Id.*) Plaintiff appealed to the Clackamas County Board of Property Tax Appeals (BOPTA), and BOPTA sustained the MAV and found an RMV of $708,527 for the 2014-15 tax year. (*Id.*) Plaintiff timely appealed to this court. In his Complaint, filed March 30, 2015, Plaintiff requested an RMV of $491,500. (Ptf''s Compl at 1.) In its Answer, filed April 13, 2015, Defendant asserted that the RMV of the subject property for the 2014-15 tax year was "no less than $708,527." (Def's Ans at 1.) At trial, however, Defendant requested that the court find an RMV of $679,000. (*See also* Def's Ex A at 18.)

Plaintiff's requested RMV is based on the sale price of $491,500. (*See* Ptf's Compl at 2; Ptf's Ex 1 at 1.) Plaintiff acknowledged at trial that he purchased the subject property at auction, but argued that the sale price was indicative of market conditions at that time. Plaintiff testified that "three to four years ago" 80 percent of the Homes in Happy Valley would have been sold at auction. Plaintiff insisted that the terms of the sale and the condition of the property negatively

affected its value. Plaintiff referred to Exhibit 2, entitled "Purchase Agreement with Joint

Escrow Instructions". (Ptf's Ex 2.) That document states:

> "Buyer understands and acknowledges that seller has or may have acquired the property through foreclosure, * * * and seller has little or no direct knowledge about the condition of the property. * * * Buyer agrees that buyer is buying the property 'as is, where is, with all faults and limitations.' "

(*Id.* at 1 (capitalization altered).) Plaintiff also emphasized the poor condition of the subject

property, testifying that the home was a "major fixer-upper." Plaintiff's Exhibit 5 contains 74

pages of copied receipts (and other documents, such as invoices and estimates), which Plaintiff

used to determine that the subject property required $106,774 in repairs. (Ptf's Ex 5 at 1.)

Plaintiff further testified that he and his wife spent over 500 hours making repairs to the

property. Plaintiff opined that, given the condition of the property and the terms of the sale, 80

percent of prospective home buyers "wouldn't touch a home like that." Plaintiff testified that, in

light of the needed repairs and the terms of the sale, the sale was "as close to arm's-length as

could be done."

To further support his requested RMV, Plaintiff identified four comparable sales. (Ptf's

Ex 7 at 1.) Plaintiff's sale 1 was a completed sale; sales 2 through 4 were pending short sales as

of late May 2015. (*Id.* at 2-5.) Plaintiff did not make adjustments to any of his comparable

properties for differences between the comparables and the subject property, such as size, age,

condition, or sale date. (*See id.* at 1-5.) Using the sale price, Plaintiff calculated the price per

square foot for each of his four comparable properties, from which he determined an average

price per square foot of $80.72. (*Id.* at 1.) Plaintiff multiplied the size of the subject property by

his average price per square foot ($80.72), and calculated a value of $443,394 for the subject

property.[3] (*Id.*)

___

[3] Plaintiff's calculation was based on 5,493 square feet for the size of the subject property. Had he used

On cross examination, Defendant questioned whether the collection of receipts in Plaintiff's Exhibit 5 accurately reflected the cost of necessary repairs to the subject property. One receipt indicated the purchase of lint rollers, an umbrella, a casserole dish, and a magnetic knife holder. (Ptf's Ex 5 at 22.) Other receipts indicated the purchase of Christmas trees and lights. (*Id.* at 36.) Plaintiff acknowledged that those items should not have been included as repairs. Plaintiff also acknowledged that pages 1 and 55 of Exhibit 5 were copies of the same receipt, and that those receipts were used twice in his calculation. (*Id.* at 1, 55.) Plaintiff further acknowledged that the receipts on pages 4 and 72 of Exhibit 5 were duplicates. (*Id.* at 4, 72.) In addition, Plaintiff testified that the duplicate receipt was for work done on a cabin he owned on Mt. Hood, not for repairs to the subject property.

Defendant's witness, Erland, is a State of Oregon Registered Appraiser who has been a county appraiser for nearly five years and who has worked for Defendant for approximately three years; he currently holds the position of Appraiser II. (Def's Ex A at 25.) Erland testified about the contents of Defendant's Exhibit A, a summary appraisal report that he prepared. Erland wrote in that report that he considered all three appraisal approaches—the sales comparison approach, the cost approach, and the income approach—to estimate the real market value of the subject property. (*Id.* at 18.) Erland analyzed all 248 residential sales in Happy Valley between October 1, 2013 and March 31, 2014. (*Id.* at 9.) Erland reported that 91.1 percent of sales were arm's-length and 8.9 percent were sales of distressed properties (bank sales and "short sales") during that time.[4] (*Id.*) Erland wrote in his report that the listing and sale of the subject property on Auction.com was "not considered to be typical of homes being sold in Happy Valley" and

Defendant's measurement of 5,581 square feet, which Plaintiff agreed was accurate, the value would have been $450,498, which is slightly higher than his value estimate of $443,394.

[4] A "short sale" is a real estate transaction where the sale price is for less than the amount of the seller's outstanding obligation on the home loan. *See* OAR 441-910-0000(3)(a).

that the sale price was considered to be below market value. (*Id.* at 5.) Erland testified that he did not consider the sale of the subject property to be arm's-length, and that, in his opinion, the sale price was "more representative of a bank liquidation value."

Erland testified that he used five comparable sales in his comparable sales analysis. The comparable sales were all homes located within 2.3 miles of the subject property. (Def's Ex A at 20.) Erland testified that all of his comparables were multi-level homes of similar quality construction to the subject property. Erland testified that he adjusted all of his comparable sales for time of sale using a 9 percent annualized increase, which he derived from an analysis of home sales in Happy Valley between 2013 and 2014. (*See also id.* at 9.) Erland testified that he made an adjustment to each of his five comparable sales of $41,473 to account for differences between the condition of the subject property, which he considered to be below average, and each of the comparables, which he considered to be average. (*See also id* at 10.) Erland testified that the $41,473 adjustment was derived from those receipts in Plaintiff's Exhibit 5 that were deemed to be for legitimate repairs to the subject property. Erland also adjusted his comparable sales for year built, lot size, square footage, and other differences with the subject property. (*See id.*) The adjusted value of Erland's comparable sales ranged from $622,027 to $778,527. (*See id.*) Erland testified that he put the most weight on comparable sale 1, which was built the same year as the subject property, was of similar quality construction, and was located in the same gated community as the subject property. Using the sales comparison approach, Erland estimated a value of $679,000 for the subject property as of the January 1, 2014, statutory assessment date. (*Id.* at 14.)

Using the cost approach, Erland estimated a value of $717,856. (Def's Ex A at 17.) Erland's report states that he also considered the income approach; but because homes in the

subject area are generally owner occupied, Erland concluded that it was not a "credible indicator of market value." (*Id.* at 18.) Erland testified, and his appraisal report indicates, that the sales comparison approach was given the most weight because "it best represents the actions of buyers and sellers of similar properties in the current marketplace." (*Id.*) Erland concluded a final reconciled estimated value of $679,000. (*Id.*)

## II. ANALYSIS

The issue before the court is the RMV of the subject property as of the assessment date of January 1, 2014. ORS 308.205 defines RMV as follows:[5]

> "Real market value of all property, real and personal, means the amount in cash that could reasonably be expected to be paid by an informed buyer to an informed seller, each acting without compulsion in an arm's-length transaction occurring as of the assessment date for the tax year."

Plaintiff argues that the RMV of the subject property on the assessment date was $491,500. Defendant has estimated the RMV of the subject property on the assessment date at $679,000.

Plaintiff has the burden of proving his case by a preponderance of the evidence. ORS 305.427. A "[p]reponderance of the evidence means the greater weight of evidence, the more convincing evidence." *Feves v. Dept. of Revenue*, 4 OTR 302, 312 (1971). To sustain his burden, Plaintiff must "provide competent evidence of the RMV of [his] property." *Poddar v. Dept. of Rev.*, 18 OTR 324, 332 (2005) (quoting *Woods v. Dept. of Rev.*, 16 OTR 56, 59 (2002)) (internal quotation marks omitted).

Where RMV is at issue, "there are three approaches of valuation (cost, income, and comparable sales) that must be considered in determining the real market value of a property even if one of the approaches is found to not be applicable." *Monserud v. Clatsop County.*

---

[5] All references to the Oregon Revised Statutes are to 2013.

*Assessor*, TC-MD 100577C, WL 2222187 at *2 (June 6, 2011); *see also* ORS 308.205(2); OAR 150-308.205-(A)(2). Defendant considered all three approaches but did not develop the income approach because the subject property is residential and unlikely to generate income. Defendant placed the greatest weight on the sales comparison approach. Plaintiff did not have a professional appraisal and did not indicate that he considered the income or cost approaches. Plaintiff did have sales data from the subject property and four comparable sales.

The sales comparison approach is often the most relevant for valuing residential properties. *Monserud*, 2011 WL 2222187 at *3. Under that approach, "[t]he court looks for arm's length sale transactions of property similar in size, quality, age and location" to the subject property. *Richardson v. Clackamas County Assessor*, TC-MD 020869D, WL 21263620 at * 3 (Mar 26, 2003). An arm's length transaction is "a transaction between unrelated parties under no duress." *Monserud*, 2011 WL 2222187 at *3 (quoting Appraisal Institute, *The Appraisal of Real Estate* 305 (13th ed 2008) (internal alteration and quotation marks omitted).

> "In utilizing the sales comparison approach only actual market transactions of property comparable to the subject, or adjusted to be comparable, will be used. All transactions utilized in the sales comparison approach must be verified to ensure they reflect arms-length market transactions. When nontypical market conditions of sale are involved in a transaction (duress, death, foreclosures, interrelated corporations or persons, etc.) the transaction will not be used in the sales comparison approach unless market-based adjustments can be made for the nontypical market condition."

OAR 150-308.205-(A)(2)(c).

Plaintiff relies on the sale price as his primary indicator of value for the subject property. The recent sale of property can be "very persuasive" evidence of its RMV, provided that "the sale is a recent, voluntary, arm's length transaction" where both parties are knowledgeable and willing. *Kem v. Dept. of Rev.* 267 Or 111, 114, 514 P2d 1335 (1973). The two important

/ / /

considerations are whether the sale was 'recent' and whether it was 'arm's-length.' *Richardson*, 2003 WL 1197444 at *2.

Plaintiff purchased the subject property at auction on March 2, 2014. The court considers that to be a recent sale with respect to the assessment date of January 1, 2014. Therefore, the court must decide whether the sale of the subject property was an arm's-length transaction. Defendant argues that the sale was not arm's-length, and that the sale price was more consistent with a bank liquidation. Plaintiff, however, testified that the sale was "as close to arm's-length as could be done."

This court has previously been reluctant to find that auction sales are arm's-length transactions. *See, e.g., Monserud*, 2011 WL 2222187 at *3-4 (holding that an auction purchase was not an arm's-length transaction and not a valid indicator of the market value of the property); *Schnabel v. Clatsop County Assessor*, TC-MD 100618D, WL 646678 at *2 (Feb 22, 2011) (holding that purchase at auction does not meet the statutory definition of an arm's length transaction). That is because "an auction eliminates the negotiation between the buyer and seller and requires buyers to negotiate with each other, generally leaving the seller out of the negotiation process." *Schnabel*, 2011 WL 646678 at *2. This court has been similarly reluctant to regard sales of bank-owned property as arm's-length transactions. *See Kryl v. Lane County. Assessor*, TC-MD 100192B, 2011 WL 1197444 at *2 (Mar. 30, 2011) (noting the "many practical reasons why the sale of property following foreclosure * * * might involve an atypical market condition rendering the transaction of little or no value as an indication of market value."). However, there are a few "narrow exceptions" to the general rule that a sale of distressed property should not be considered to be a reliable indicator of real market value. *Brashnyk v. Lane County Assessor*, TC-MD 110308, WL 6182028 at *5 (Dec 12, 2011). The

Oregon Supreme Court has recognized that a property purchased through foreclosure may still be considered an arm's-length transaction. *See Ward v. Dept. of Revenue*, 293 Or 506, 508, 650 P2d 923 (1982). This court has observed that "where the majority of sales are distress," such sales may "provide a more accurate reflection of the market." *Morrow County Grain Growers v. Dept. of Rev.*, 10 OTR 146, 148 (1985); *see also Voronaeff v. Crook County. Assessor*, TC-MD 110361C, WL 1426847 (Apr 25, 2012).

Here, the subject property was sold at auction after foreclosure by the bank. Plaintiff purchased the property as-is, and the purchase agreement stated that "seller has little or no direct knowledge about the condition of the property." (Ptf's Ex 2 at 1.) Such circumstances do not suggest an arm's-length transaction. Indeed, a sale by a bank following foreclosure, at auction, where the seller has little or no direct knowledge of the property strongly suggests "duress or compulsion" on the part of the seller. *See Brashnyk*, 2011 WL 6182028, at *5.

Moreover, Defendant presented credible evidence that, at the time of the assessment date, 91.1 percent of home sales in the subject area were arm's-length transactions, with the remainder being bank sales and short sales. That means that sales such as the sale at issue here, a bank sale through an online auction website, would not have been representative of the market at that time. Plaintiff testified that "three to four years ago" auction sales would have comprised a majority of the sales in the subject area; however, Plaintiff did not present any evidence to show that auction sales were typical of the market as of the assessment date. Indeed, Plaintiff appeared to accept Defendant's conclusion regarding the prevalence of arm's-length sales at a face value. Accordingly, the court finds that the sale of the subject property was not an arm's length transaction, and the auction sale was not typical of market conditions at the time. The sale price is thus not a reliable or persuasive indicator of RMV. It may be true, as Plaintiff emphasized at

trial, that the sale price was a reasonable one, given the terms of the sale. But what is reasonable for a foreclosure property sold as-is at auction is not persuasive evidence of its statutory RMV, which presumes an arm's-length transaction between an informed seller and an informed buyer. *See* ORS 308.205.

Plaintiff also relied on four home sales in the Happy Valley area to support his requested RMV. Three of the four sales were pending short sales. (Ptf's Ex 7.) Plaintiff calculated an average price per square foot based on the sale price for each property. He used that average to compute an estimated value that was near, but less than, his requested RMV. The court finds Plaintiff's analysis unpersuasive for two reasons.

First, three out of four of Plaintiff's comparable sales were short sales. OAR 150-308.205-(A)(2)(c) provides that sales that are not typical of market conditions should not be used in the sales comparison approach "unless market-based adjustments can be made * * *." As described above, the evidence before the court shows that short sales were not typical of the market on the assessment date. Therefore, short sales should not be used in the sales comparison approach unless the appraiser can make market-based adjustments. However, Plaintiff did not adjust the properties to reflect market conditions.

Second, in addition failing to adjust the short sale properties for market conditions, Plaintiff failed to adjust his comparable sales for *any other* differences between those comparables and the subject property. As this court has previously explained:

"[a]djustments are a key component in evaluating properties. * * *

"Ideally, if all comparable properties are identical to the subject property, no adjustments will be required. However, this is rarely the case * * *. After

/ / /

/ / /

researching and verifying transactional data and selecting the appropriate unit of comparison, the appraiser adjusts for any differences. * * *

"Raw, unrefined price information is not enough."

*Zakharyuk v. Clackamas County Assessor*, TC-MD 080357B, WL 5273295 at *2 (Dec 12, 2008) (quoting Appraisal Institute, *The Appraisal of Real Estate* 307 (13th ed 2008) (internal quotation marks omitted). Because Plaintiff did not adjust any of his comparable sales and relied on sales that do not reflect market conditions, the court finds Plaintiff's comparable sales analysis to be incomplete and unpersuasive.

In addition, Plaintiff offered 74 pages of receipts to support his contention that the subject property required extensive repairs. Defendant spent a considerable amount of time at trial challenging the relevance of those receipts and questioning Plaintiff's calculation of necessary repairs. That led Plaintiff to acknowledge that some of the receipts were duplicative, others were for personal items unrelated to the repair of Plaintiff's home, and at least one receipt related to an entirely different property. However, the court notes that both parties agree that the subject property was in need of repairs when it was purchased by Plaintiff, and while Plaintiff used the receipts to calculate a value for those repairs—$106,774—Plaintiff did not rely on that value to determine the subject property's RMV.[6] Plaintiff's receipts, therefore, lend little support to the requested RMV.

"[I]f the evidence is inconclusive or unpersuasive, the taxpayer will have failed to meet his burden of proof." *Reed v. Dept. of Rev.,* 310 Or 260, 265, 798 P2d 235 (1990). For the

/ / /

---

[6] Plaintiff's requested RMV is the sale price of $491,500. The sale price, if found to be a reliable indicator of RMV, already takes into account the condition of the property at the time of sale. And because Plaintiff did not adjust his comparable sales for differences in condition, Plaintiff's repair value does not directly support his comparative sales analysis.

reasons stated above, the court finds that Plaintiff's evidence of RMV is unpersuasive. Therefore, Plaintiff has failed to meet his burden of proof.

The court has jurisdiction to determine RMV based on the evidence before it, "without regard to the values pleaded by the parties." ORS 305.412. That does not mean, however, that the burden of proof has shifted to Defendant. *Etzger v. Clatsop County Assessor*, TC-MD 120534D, WL 5350257 at *5 (Oct 30, 2012). Defendant's appraiser, Erland, estimated that the subject property's RMV was $679,000 as of the assessment date. Erland's estimate was primarily based on the sales comparison approach. Erland considered five comparable sales in his appraisal, and he adjusted each sale for differences with the subject property, including year built, date of sale, lot size, and square footage. Erland made a negative adjustment of $41,473 to each comparable sale to account for the subject property's below average condition. In addition, Erland used the cost approach to support his estimated RMV. The court finds Erland's appraisal to be reasonable and well supported. Based on the evidence before it, the court finds that the RMV of the subject property on the assessment date, January 1, 2014, was $679,000.

### III. CONCLUSION

Plaintiff's evidence of RMV is unpersuasive; Plaintiff has therefore failed to carry his burden of proof. Based on the evidence before it, the court finds that the subject property's RMV, Account 05010141, was $679,000 as of the assessment date. Now, therefore,

IT IS THE DECISION OF THIS COURT that Plaintiff's appeal is denied.

IT IS FURTHER DECIDED that the real market value of the subject property identified as Account 05010141, was $679,000, as of the January 1, 2014 assessment date.

/ / /

/ / /

IT IS FURTHER DECIDED that Defendant's request for costs and disbursements, made in its Answer and Counterclaim, is denied.

Dated this ___ day of August 2015.


_____
DAN ROBINSON
MAGISTRATE

*If you want to appeal this Final Decision, file a complaint in the Regular Division of the Oregon Tax Court, by mailing to: 1163 State Street, Salem, OR 97301-2563; or by hand delivery to: Fourth Floor, 1241 State Street, Salem, OR.*

*Your complaint must be submitted within 60 days after the date of the Final Decision or this Final Decision cannot be changed. TCR-MD 19 B.*

*This document was filed and entered on August 28, 2015.*